Grover H. NORTON and Yellow Freight
System, Inc., Appellants,

v.

I. A. M. NATIONAL PENSION FUND.

No. 76–1269.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1977.

Decided March 21, 1977.

John V. Long, Washington, D. C., with
whom Alfred Lawrence Toombs, Wash-

ington, D. C., was on the brief, for appellants.

Denis F. Gordon, Washington, D. C., with whom Mozart G. Ratner, Washington, D. C., was on the brief, for appellee.

Before BAZELON, Chief Judge and McGOWAN and MacKINNON, Circuit Judges.

Opinion for the court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

The issue in this appeal from the District Court is whether the I.A.M. National Pension Fund acted in an arbitrary and capricious manner in denying appellant Norton's application for pension benefits. Norton and his employer, Yellow Freight System, Inc., brought suit in the District Court to compel payment of the pension. On cross-motions for summary judgment, the District Court ruled in favor of the Fund. Since we believe the Fund's actions to have been arbitrary and capricious in several respects, we reverse.

I

The I.A.M. National Pension Fund (originally the I.A.M. Labor-Management Pension Fund) was established in 1960 to provide retirement benefits for employees who are represented for the purpose of collective bargaining by chartered lodges of the International Association of Machinists and Aerospace Workers ("I.A.M."). Under the terms of the pension plan adopted by the Fund's trustees, the size of an employee's pension is directly related to the amount of his employer's contributions to the Fund on his behalf. To qualify for benefits, an employee must have, *inter alia*, a minimum of ten years of "credited service," defined as the sum of "past service" (meaning periods of employment prior to the time the em-ployer commenced contributions to the Fund) and "future service" (periods of employment during which employer contributions were made).

Norton was employed as a garage mechanic by Yellow Freight and its corporate predecessors from some time in 1952 or 1953 until his retirement, allegedly because of a permanent physical disability, on May 12, 1975. In 1958, he became a member of District Lodge No. 46 of the I.A.M., which was the statutory collective bargaining representative of the unit in which he was employed. In November of 1961, Yellow Freight's predecessor entered into a collective bargaining agreement with I.A.M. District Lodge No. 46 and Local Lodge 35, effective December 1, 1961, which incorporated the terms of the I.A.M. Pension Plan and obligated the employer to make contributions to the Fund on behalf of the employees in Norton's bargaining unit. Thus, Yellow Freight's predecessor began making contributions for Norton's benefit in December 1961; at that time, Norton was credited with eight years of "past service."

Contributions on behalf of Norton were made, and accepted by the Fund, on a continuous basis from December 1961 through February of 1973. On September 25, 1966, Norton attained the age of fifty-five and thus became eligible for an "early retirement pension," pursuant to Article V, Section 4 of the Plan Rules then in effect, which established the following requirements for early pension eligibility: (1) the employee must be 55 years of age or older; (2) he must have accrued at least 10 years of credited service; and (3) he must have received at least six months of future service credit.[1] The latter two requirements clearly were satisfied, since Norton had compiled more than four years of future service credit, in addition to the eight years of past service credit he was granted in 1961.

On December 1, 1966, Norton completed his fifth year of future service and his right

---

1. Article V, Section 4 has since been amended to require twelve, rather than six, months of future service credit as a precondition for early retirement pension eligibility. *See* Brief of Appellants, Exh. A, at 52.

to receive a pension therefore became "vested" pursuant to Article IV, Section 4 of the Plan Rules, which at all relevant times has provided that when an employee (1) has accumulated at least ten years of credited service including a minimum of five years of future service credit, and (2) has attained age 50, he acquires a "vested right" to receive his pension (upon reaching retirement age and making application in the required manner).[2] Article IV, Section 4 also specifies, however, that this "vested right" is subject to the provisions of Article IX of the Plan Rules.

Article IX sets forth the basis for terminating participation in the Plan by employers who are delinquent in making agreed-upon contributions to the Fund, and for denying benefits to employees of delinquent employers. In addition, Section 4 of Article IX provides for penalties to employees working for employers who cease to be obligated to contribute to the Fund, but remain in business. At the time Norton's rights "vested," and at all times prior to July 1, 1973, the specified penalty consisted of a forfeiture of all past service credits.[3]

In December 1972, Norton requested and received a pension application from the Fund. In its brief, the Fund concedes that had Norton filed his application at that time he would have qualified for an early retirement pension under the provisions of Article V outlined earlier. However, the Fund contends that the application was not submitted until July 1974. Norton claims that he filed the application with the secretary of his lodge the same month in which he received it, but takes the position that whether the application was submitted then or in 1974 is immaterial to the issues presented here. For purposes of this appeal, therefore, we assume that the application was received by Norton, but not filed, in December 1972.

On or about March 1, 1973, all of the Yellow Freight employees in Norton's bargaining unit, *except* Norton, resigned from Lodge 35 of the I.A.M. and joined a local of the Teamsters Union. Norton retained his membership in the I.A.M. and continued to pay his union dues. However, since Lodge 35 was no longer the designated exclusive representative of a majority of the employees in Norton's bargaining unit, no further negotiations took place between Lodge 35 and Yellow Freight concerning that unit, and the collective bargaining agreement then in effect between Yellow Freight and Lodge 35 expired by its own terms on June 30, 1973 and was not renewed. Yellow Freight continued to tender contributions to the Fund on Norton's behalf during the pendency of the collective bargaining agreement, and thereafter until Norton's retirement in May 1975, but starting in March 1973 the Fund refused to accept any payments from Yellow Freight.

On June 13, 1973, the Fund's trustees adopted a resolution amending Article IX,

---

**2.** *See* Brief of Appellants, Exh. A, at 28, 48–49. The manual issued by the Fund to explain the I.A.M. Pension Plan to covered employees states:

> Once an employee's benefits become vested he will not lose his right to a pension from the Plan if he stops working for a Contributing Employer. He can apply for a pension whenever he elects to do so, at age 55 or older.

*Id.* at 28; *see id.* at 27 (no loss of pension eligibility because of break in future service, if pension rights have vested under Article IV, Section 4).

**3.** Prior to July 1, 1973, Article IX, Section 4 provided in full:

> Section 4. Withdrawal by Active Employer
>
> In the event that a Contributing Employer ceases to be obligated to make contributions

to the Fund at any time after the period ending 48 months after its [initial] Contribution Date, and should that Employer or its successor thereafter continue in business, all years of Past Service credit based on employment with such Employer shall be cancelled retroactively, notwithstanding any contrary provisions contained elsewhere in this Plan. This Section shall not apply to any Pensioner whose benefits first became payable prior to the time the Contributing Employer ceased to be obligated to make contributions to the Fund, nor shall this Section apply to the Past Service credit of any Covered Employee whose employment with such Employer had terminated at least 24 months prior to the time the Contributing Employer ceased to be obligated to make contributions to the Fund.

*See* Brief of Appellants, Exh. B; J.A. 83.

Section 4 of the Plan Rules, effective July 1, 1973, so as "to increase the forfeiture imposed on employees of an active employer who 'withdraws' from the Plan, from all *past* service to all *credited* service," Brief for the Appellee I.A.M. National Pension Fund at 7 (emphasis in original). The revised rule provided an exception to this forfeiture for employees "whose employment ends within thirty (30) days of the employer's termination . . .," but under the terms of the amendment those employees who stayed with the employer would lose all service credit, including credit earned while the employer was making contributions to the Fund on their behalf.[4] According to the Fund Administrator,

> the Trustees concluded that the continued soundness of the Fund required amendment of Article IX, Section 4 in a way which would increase the incentive for employees covered by the Fund to prevent, wherever possible, withdrawal from the fund by active contributing employers.

Affidavit of Frank A. Higgins, J.A. 84.

On June 28, 1973, two days prior to the expiration of the collective bargaining agreement between Yellow Freight and I.A.M. Lodge 35, and three days before the effective date of the amendment to Article IX, the Fund Administrator sent a letter addressed jointly to Yellow Freight's Vice President for Labor Relations and to I.A.M. District Lodge No. 46, with copies to Norton and the other members of his bargaining unit, informing them as to the consequences of the shift in union membership by Norton's fellow employees. On that same date, a similar letter was sent to the attorney then representing Norton, who had requested information about Norton's pension status in light of his compatriots' resignation from I.A.M. A copy of this second letter was also mailed directly to Norton. Both letters advised that the transfer of jurisdiction over Norton's bargaining unit from the I.A.M. to the Teamsters constituted a withdrawal by Yellow Freight, within the meaning of Article IX, Section 4 of the Plan Rules, from participation in the Fund. The letters further advised that Article IX, Section 4 required each employee's credited service to be cancelled unless he "terminates his employment within thirty (30) days of this letter and thereafter becomes employed in a Company which is a Contributing Employer to

---

**4.** The amended version of Article IX, Section 4 provided in full:

Section 4. Withdrawal by Active Employers

a. If the participation of a Contributing Employer terminates and should that employer, or its successor, thereafter continue in the same or related business, then all credited Service based upon employment with such employer shall be cancelled retroactively, notwithstanding any contrary provision of this Plan.

b. Credited Service shall not be cancelled for the following persons:

(1) Covered Employees whose employment with such employer had ended at least 24 months before the participation of the Contributing Employer terminates; or

(2) Covered Employees whose employment with such employer ends within thirty (30) days of the employer's termination; or

(3) Covered Employees in a bargaining unit which is transferred to the jurisdiction of another I.A.M. Lodge, provided that:

(i) No member of that Lodge is a Covered Employee under this Plan; and

(ii) The employee's rights under this Plan are vested under Article IV, Section 4; and

(iii) Pension benefits under this Plan are not duplicated under another pension plan.

c. Covered Employees shall have their Credited Service reinstated if they earn at least five years of Future Service credit at any time within the eight (8) year period following the date the participation of the Contributing Employer terminates.

d. Pensioners shall not lose their Credited Service if their benefits were effective before the participation of the employer terminates; provided, however, that if the participation of the employer terminates within 48 months of its Contribution Date, then all pensions based upon Credited Service with that employer shall be ended or reduced if the total amount contributed, less benefit payments already made, is less than the actuarially determined value of the pension benefits thereafter payable with respect to such Pensioners.

Briefs of Appellants, Exh. A, at 62–63.

the I.A.M. Labor-Management Pension Fund." [5]

On July 11, 1973, thirteen days after these "thirty-day" notices were sent, the Fund informed Norton by written memorandum that

All [of your] credited Service is cancelled. Your Pension Application [which was mailed to you in December 1972] is Void.

Reply Brief of Appellants, Exh. B. Thus, Norton was stripped of the eight years of past service credit and over eleven years of future service credit which he had earned; and when the Fund received his application, which we assume to have been in July 1974 as claimed by the Fund, no pension benefits were awarded.

The amendment to Article IX, Section 4 was repealed in December 1974, thereby restoring the prior rule under which past service, but not future service, credit is forfeited when an employer ceases participation in the Fund. However, the Fund evidently deemed this reversion to the prior rule to be inapplicable to Norton: in August 1975, subsequent to his retirement in May 1975, Norton submitted a second application for pension benefits, but it was rejected. This second application apparently claimed that Norton's retirement was due to a permanent physical disability. If this claim had been accepted, and had the Fund not already cancelled his credited service, Norton would have been entitled under the Plan Rules to 110% of an early retirement pension [6] calculated by reference to his years of service.

Norton and Yellow Freight brought this action on April 25, 1975, against the trustees of the I.A.M. Labor-Management Pension Fund [7] seeking (1) a declaratory judgment establishing Norton's eligibility for a pension under the Fund and stating the number of years of credited service to which Norton is entitled, and (2) an injunction ordering the Fund to pay Norton the pension due to him. The District Court's order of summary judgment in favor of the Fund was entered on January 20, 1976, and was based on the following finding which was included therein:

It is undisputed that defendant The I.A.M. National Pension Fund enacted a rule change requiring, as a condition of eligibility, that an otherwise covered employee such as plaintiff end his employment within 30 days of employer's termination of participation in defendant The I.A.M. National Pension Fund, that plaintiff had proper notice of said rule change and failed to comply therewith or to make timely application for a pension.

J.A. 107. The Court concluded that the Fund "has not acted in an arbitrary or capricious manner with respect to the eligibility or application for pension of plaintiff . . . Norton, and further that the . . . Fund has properly discharged any legal duty owed to plaintiffs Norton and Yellow Freight System . . . .."

II

■ The parties agree that the legal standard applied by the District Court— whether the Fund's actions were arbitrary or capricious in light of all the circumstances involved—defines the proper extent of judicial review over the denial of Norton's pension application. See, e.g., Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 277, 410 F.2d

---

**5.** The language quoted in text is from the letter to Norton's counsel, J.A. 92. The letter to Yellow Freight and District Lodge No. 46 used virtually identical language:

To avoid cancellation of Credited Service an employee must terminate his employment within (30) days of the date of this letter, and thereafter become employed by a Company who is a Contributing Employer to the I.A.M. Labor-Management Pension Fund.

Reply Brief of Appellants, Exh. A.

**6.** Norton could not have qualified for a "normal pension" since he was 63 years of age at the time of his retirement, and eligibility for a normal pension does not attach until an applicant reaches age 65. See Brief of Appellants, Exh. A, at 50.

**7.** By stipulation of the parties and pursuant to an order entered on October 31, 1975, the I.A.M. National Pension Fund was substituted as the sole defendant in place of the trustees.

262, 265 (1969); *Roark v. Lewis,* 130 U.S. App.D.C. 360, 361–362, 401 F.2d 425, 426–27 (1968) ("*Roark I*")· *Kosty v. Lewis,* 115 U.S.App.D.C. 343, 346, 319 F.2d 744, 747 (1963), *cert. denied,* 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); *Danti v. Lewis,* 114 U.S.App.D.C. 105, 108, 312 F.2d 345, 348 (1962). Appellants contend, however, that the District Court erred in concluding that the Fund's treatment of Norton was not arbitrary or capricious. They advance a number of arguments in support of this contention, including the following: (1) the 1973 amendment to Article IX, Section 4 imposes an unreasonable forfeiture on employees for whose benefit contributions into the Fund have been made; (2) the 1973 amendment was improperly applied to events which took place before it was passed; (3) the forfeiture provisions of both the original and amended versions of Article IX, Section 4 are arbitrary as applied to Norton, since his right to receive a pension had become "fully matured," and his application was denied solely on the basis of the actions of his fellow employees, over whom he had no control; and (4) Norton was given no reasonable notice or opportunity to retire and receive his pension benefits before the forfeiture of his service credits was effected. Acceptance of either of the first two arguments would mean that Norton is at least entitled to a pension based on future service credit, pursuant to the version of Article IX, Section 4 in effect prior to the 1973 amendment; the latter two arguments would be grounds for awarding Norton a pension based on all of his credited service, including past service.

Appellants' argument that the 1973 amendment to Article IX was unreasonable, and in that sense arbitrary and capricious, finds considerable support in this court's decisions regarding the "signatory last employment" requirement of the United Mine Workers of America Welfare and Retirement Fund of 1950. Pursuant to that requirement an employee was not eligible for a pension unless his last regular employment before retirement was with a signatory, or contributing, coal operator. In *Roark*

*I, supra,* we held that requirement to be *prima facie* unreasonable, and remanded the case to the District Court for a hearing at which the fund's trustees would be given an opportunity to "show what, if any, reasonable relationship exists between the purposes of the Fund and the [signatory last employment] requirement." 130 U.S.App. D.C. at 363, 401 F.2d at 428. Judge Tamm's opinion for the court observed:

> If the Fund's purpose is to pay benefits to contributing employers' employees (whose work generated the contributions), it is difficult to see how such a requirement promotes that purpose. It makes employees like these appellants sacrifice an otherwise valid pension claim because they worked a relatively short time for non-contributing operators. The contributions which signatory operators made on their behalf did not evaporate as a result of their later employment with non-signatories.

*Id.*

Upon review of the District Court's decision on remand from *Roark I,* this court concluded that the justifications offered by the trustees did not provide a rational basis for the signatory last employment requirement. *Roark v. Boyle,* 141 U.S.App.D.C. 390, 393–397, 439 F.2d 497, 500–04 (1970) ("*Roark II*"). The panel recognized that the financial integrity of the fund, and the interest in encouraging workers to stay with an employer who had made contributions for their benefit, might constitute legitimate reasons for such a requirement, but found that neither of those purposes was rationally furthered, inasmuch as the UMWA Fund awarded flat pensions unrelated to the number of years of service with a contributing employer. *See id.* at 393–401, 439 F.2d at 500–08.

On the basis of the record before us, we are unable to see how the 1973 amendment to Article IX is rationally related to any legitimate purpose of the I.A.M. Fund. The only explanation for the amendment appearing in the record is the one supplied by the Fund Administrator's affidavit: the

trustees concluded that "the continued soundness" of the Fund required an increase in covered employees' incentive to prevent withdrawal from the Fund by active contributing employers. *See* text following note 4 *supra*. But, even assuming that forfeiture of past service credit might be necessary in some circumstances to protect the Fund, the Fund's integrity would not appear to be threatened by the payment of pensions based on future service credit, since such credit by definition is backed by employer contributions on the pensioners' behalf.[8] And, of course, the increase in sanctions to the employee for a "withdrawal" from the Fund by his employer cannot be justified as a measure to provide the employee with an incentive to remain with his employer.

■ Nevertheless, in light of the other arguments which appellants advance, we need not reach a final decision, or order further proceedings in the District Court, on the reasonableness *per se* of the 1973 amendment. Whether or not a rational basis for the amendment can be adduced, we agree with appellants that its retroactive application to the "withdrawal" by Yellow Freight was arbitrary and capricious. *Cf. Lavella v. Boyle,* 144 U.S.App.D.C. 35, 444 F.2d 910, *cert. denied,* 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 89 (1971). The amendment was adopted *after* Norton's fellow employees had already resigned membership in the I.A.M. To the degree that the new rule was intended to shape employees' incentives, it could rationally be applied only to future events. Moreover, on any theory which might support the denial of pension benefits to Norton, Yellow Freight's "with-

drawal" could have taken place no later than June 30, 1973, the date its collective bargaining agreement with the I.A.M. lodges expired; and yet the trustees' resolution declared that the amendment would not be effective until July 1, 1973.[9]

More fundamentally, we are convinced that under the circumstances presented here, application of the forfeiture provisions of either the original or the amended version of Article IX, Section 4 to Norton would have been arbitrary and capricious. Regardless of whether those provisions could lawfully be applied to other employees in other contexts, we think it manifestly unfair to reduce or cancel Norton's fully matured, "vested" pension rights solely on the basis of the actions of his fellow employees. The Fund accepted over eleven years' worth of employer contributions on Norton's behalf, and it is uncontested that had he chosen to retire at any time during the period from September 25, 1966 until March 1, 1973, he would have qualified in full for an early retirement pension based on all of his credited service.

Indeed, for the portion of that period after his pension rights "vested" in December 1966, Norton could voluntarily have left Yellow Freight's employ and accepted a job with another, non-contributing employer without losing any of his pension eligibility. *See* note 2 *supra*. Given that Norton retained his membership in the I.A.M. throughout the events in this case, and almost certainly could not have done anything to prevent the shift in union representation in his bargaining unit, the Fund had no legitimate basis for divesting Norton of his previously existing pension rights.

8. At argument, counsel for the Fund appeared to suggest that its fiscal integrity would be undermined, even by payment of pensions based only on future service credit, if the number of employees covered by the plan were not maintained at a certain level. Given the fact that future credits are backed by employer contributions, we find this difficult to understand, unless the level of the payments is somehow based on assumptions regarding contributions to be made in the future. There is no evidence in the record that this is the case. And, in any event, it is hard to accept any argument that

the 1973 amendment was necessary to ensure the Fund's soundness, in light of the fact that the amendment was repealed less than a year and a half after its enactment.

9. Given the flat denial of Norton's second application for benefits, filed after the 1973 amendment had been repealed, the Fund cannot argue that its actions were guided by the version of Article IX in effect at the time the employee filed his application.

Past cases in this circuit have overturned, as arbitrary and capricious, denials of pension benefits to employees who were prevented through no fault of their own from satisfying some final requirement for pension eligibility, after substantial contributions to a pension fund had been made on their behalf. For example, in *Teston v. Carey,* 150 U.S.App.D.C. 256, 464 F.2d 765 (1972), a panel of this court struck down a signatory last employment requirement as applied to a miner who had 11 to 12 years of contributory service with a signatory employer, but because of economic conditions lost his job in the coal industry. As Judge Wilkey noted for the court:

> Given his years of service, and admitted contributions by his employer (and himself) to the pension Fund, a rule which denies a pension to an applicant in the situation of *Teston* . . . cannot be deemed reasonable, fair, or equitable.

*Id.* at 260, 464 F.2d at 769. *See also DePaoli v. Boyle,* 144 U.S.App.D.C. 364, 447 F.2d 334 (1971); *Lavella v. Boyle, supra.*

Moreover, in *Lee v. Nesbitt,* 453 F.2d 1309 (9th Cir. 1972), the Ninth Circuit held unreasonable under the circumstances a "break-in-employment" rule which operated to cancel a particular seaman's previously earned service credits, upon his temporary and involuntary unemployment prior to retirement age, when those credits would have qualified him for a pension when he later retired from the industry at the requisite age. Inasmuch as Norton had fully satisfied all of the requirements for a pension prior to the time that his service credits were cancelled because of events beyond his control, the Fund's actions here were even more arbitrary and capricious than the actions condemned in *Teston* and *Lee.*

The Fund argues, and the District Court found, that denial of Norton's pension application was not arbitrary or capricious since he was given advance notice of the amendment to Article IX, Section 4, and was afforded an opportunity to avoid cancellation of his credited service by leaving Yellow Freight's employ within thirty days after its withdrawal from participation in the Fund. This argument fails for at least two reasons. First, as appellants point out, Norton did not in fact receive an adequate chance to terminate employment with Yellow Freight before his service credits were revoked. The Fund's notices of June 28, 1973 promised Norton thirty days within which to terminate employment, but his service credits were cancelled and his pension application was voided a mere thirteen days later.

■ Second, the June 28 notices made clear that the Plan Rules, as interpreted by the Fund Administrator, allowed Norton only two options: leave Yellow Freight and secure employment with a company actively contributing to the Fund, or lose all credited service. To put Norton to this "hard choice," *see Roark II, supra,* 141 U.S.App. D.C. at 400, 439 F.2d at 507, when he already had satisfied all of the requirements for pension eligibility, when he could previously have left Yellow Freight to join a non-contributing employer without losing that eligibility, and when he had done nothing to terminate Yellow Freight's participation in the Fund, was clearly unreasonable. At a *minimum,* in order to divest a person in Norton's position of *any* of his service credit, he must be given a rationally calculated opportunity "to elect between [retiring and] taking [a] pension [based on all of his credited service] or continuing in employment subject to" a loss of pension rights. *See Kosty v. Lewis, supra,* 115 U.S. App.D.C. at 377, 319 F.2d at 748. This was not done here.[10]

### III

For the foregoing reasons, we conclude that Norton is entitled to an early retirement pension calculated with reference to

---

10.. We need not, and do not, decide whether the Fund lawfully could have imposed a forfeiture on Norton, had he been offered a fair opportunity to retire and collect a pension based on all of his credited service.

all of his credited service, including past service. Some questions remain, however, before the exact amount owing to Norton can be determined. These include, first, how much future service credit Norton has earned[11] and, second, whether Norton's retirement was due to a permanent physical disability qualifying him for a 10% supplement to his pension.

Accordingly, we reverse the order of the District Court granting summary judgment in favor of the Fund, and remand for further proceedings consistent with this opinion.

*It is so ordered.*

11. At the very least, there seems to be some dispute as to whether Norton could accumulate service credits after Yellow Freight's collective bargaining agreement with the I.A.M. lodges expired.